UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHOLIC LEAGUE FOR RELIGIOUS AND CIVIL RIGHTS, DR. RICHARD SONNENSHEIN, and VALERIE MEEHAN, | No. C 06-2351 MHP |
| Plaintiff, | **MEMORANDUM & ORDER** |
| v. | **Re: Defendants' Motion to Dismiss** |
| CITY AND COUNTY OF SAN FRANCISCO, AARON PESKIN, in his official capacity as President, Board of Supervisors, City and County of San Francisco, and TOM AMMIANO, in his official capacity as a Supervisor, Board of Supervisors, City and County of San Francisco, | |
| Defendants. | |

    Plaintiffs Catholic League for Religious and Civil Rights, Dr. Richard Sonnenshein, and Valerie Meehan (collectively "plaintiffs") filed this action against defendants City and County of San Francisco, Aaron Peskin, and Tom Ammiano (collectively "defendants" or "the City") alleging that defendants violated the Establishment Clause of the First Amendment to the United States Constitution.  The dispute arises over a resolution passed by the Board of Supervisors in response to a statement by the Congregation for the Doctrine of Faith at the Vatican concerning the adoption of children by same-sex couples.  Now before the court is defendants' motion to dismiss plaintiffs' complaint for failure to state a claim on which relief can be granted.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

<p>

BACKGROUND

The Catholic League for Religious and Civil Rights is a Catholic civil rights organization organized to defend the right of Catholics to participate in American public life without defamation or discrimination. Compl. ¶ 10. The League has approximately 6,000 members residing in the City and County of San Francisco. Id. Plaintiffs Sonnenshein and Meehan are Catholic residents of San Francisco. Id. ¶¶ 11–12. Plaintiffs assert that the religious teachings of the Catholic Church require the disapproval of homosexual behavior and prohibit the legal recognition of homosexual unions. Id. ¶ 20. Plaintiffs further claim that, under Catholic teachings, "[a]llowing children to be adopted by persons living in such [homosexual] unions would actually mean doing violence to these children," and therefore "Catholic organizations must not place children for adoption in homosexual households." Id. ¶ 21.

Consistent with these tenets, the Congregation for the Doctrine of the Faith ("Congregation"), an organization within the Catholic Church charged with "promot[ing] and safeguard[ing] the doctrine on the faith and morals throughout the Catholic world," issued a document in 2003 entitled "Considerations Regarding Proposals To Give Legal Recognition To Unions Between Homosexual Persons" ("Considerations document"). Id. ¶ 28; Defendants' Request for Judicial Notice ("RJN"), Exh. A. According to plaintiffs, "[t]his document outlines the moral duty of Catholics to oppose homosexual unions and policies that allow homosexual partners to adopt children," policies which the document describes as "'gravely immoral.'" Compl. ¶ 28.

In March 2006, Cardinal William Joseph Levada, the head of the Congregation for the Doctrine of the Faith, issued a directive to the Archdiocese of San Francisco instructing the Archdiocese to stop placing children in need of adoption with homosexual households. Compl. ¶ 29; RJN, Exh. F. That same month, the San Francisco Board of Supervisors Unanimously adopted Resolution No. 168-06 ("the Resolution"), which reads:

> Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.

2

> WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City's existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and
> WHEREAS, The statement of Cardinal Levada and the Vatican that "Catholic agencies should not place children for adoption in homosexual households," and "Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children" are absolutely unacceptable to the citizenry of San Francisco; and
> WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and
> WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and
> WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and
> WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it
> RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation of the Doctrine of Faith [sic] at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.

Compl. ¶ 29; RJN, Exh. F. Plaintiffs also allege that defendants have threatened to withhold funding from Catholic Charities of the Archdiocese of San Francisco if they comply with the Cardinal's directive. Compl. ¶ 31.

Plaintiffs filed their complaint on April 4, 2006, alleging that Resolution 168-06 violates the Establishment Clause of the First Amendment to the United States Constitution, and requesting that the court permanently enjoin defendants from criticizing and attacking religion and religious beliefs. Defendants now move to dismiss the complaint, alleging that plaintiffs have failed to plead a cognizable claim under the Establishment Clause.

3

LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim—and not the claim's substantive merits—"a court may [typically] look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.), cert. denied, 484 U.S. 944 (1987). Similarly, the court may consider documents that are not physically attached to the complaint where the authenticity of the documents is not contested and the complaint necessarily relies on them. Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001). In addition, pursuant to Federal Rule of Evidence 201, "a court may take judicial notice of 'matters of public record'" without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. Id. (quoting Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986)).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

DISCUSSION

I.      Judicial Notice

Defendants have requested that the court take judicial notice of several documents pursuant to Federal Rule of Evidence 201. For the purposes of a 12(b)(6) motion to dismiss, the court may take judicial notice of "matters of public record." Lee, 250 F.3d at 688–89. Therefore, the court will take judicial notice of RJN, Exh. D (Assembly Bill No. 205), Exh. F (Resolution 168-06), Exh. H (San Francisco Board of Supervisors Resolutions Numbered 129-06, 166-06, 364-06, 73-05, 127-05, 454-05, 308-03 and 199-00) and Exh. I (Grant Agreements between the City and County of San Francisco and Catholic Charities). In addition, the court is free to consider for the purposes of this motion RJN, Exh. A, "Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons," because the authenticity of this document is not in dispute and plaintiffs' complaint relies on it. Lee, 250 F.3d at 688.

The court will not take judicial notice of the remaining documents, which are news articles and not matters of public record. Likewise, the court will not consider the factual assertions made by either party that go beyond the complaint or the documents discussed above, such as the religious affiliations and/or "lifestyles" of City officials.

II.     Establishment Clause

In cases alleging that a state actor has violated the Establishment Clause by disapproving a particular religion, the Ninth Circuit applies the test articulated in Lemon v. Kurtzman, 403 U.S. 602 (1971). Vernon v. City of Los Angeles, 27 F.3d 1385, 1396 (9th Cir. 1994). Under this test, the challenged action must "(1) have a secular purpose; (2) have a primary effect which neither advances nor inhibits religion; and (3) not foster excessive state entanglement with religion." Id. If Resolution 168-06 fails any one of these three prongs, it is invalid under the Establishment Clause. Id. at 1396–97.

A.      American Family Ass'n, Inc. v. City & County of San Francisco

This is not the first time the City has clashed with a religious group over statements regarding homosexuality. Indeed, the facts of American Family Ass'n, Inc. v. City & County of San Francisco, 277 F.3d 1114 (9th Cir. 2002), are so similar to the case at bar as to warrant a thorough discussion.

In American Family Ass'n, the plaintiffs were religious groups that ran an advertising campaign identifying homosexuality as a "sexual sin" and claiming that "many have walked out of homosexuality." Id. at 1119. The ads also claimed that homosexuals were more likely to engage in "self-destructive behavior," including alcohol, drug abuse, emotional and physical violence, and acquiring sexually transmitted diseases. Id.

The City took several steps in response to the ad campaign. First, the Board of Supervisors sent a letter to the plaintiffs denouncing their "hateful rhetoric against gays, lesbians and transgendered people," and claiming that "there is a direct correlation between these acts of discrimination, such as when gays and lesbians are called sinful and when major religious organizations say they can change if they tried, and the horrible crimes committed against gays and lesbians." Id. In addition to this letter, the City adopted two resolutions. Id. One condemned the murder of a gay man in Alabama and urged Alabama lawmakers to extend hate crime protection to homosexuals. Id. The resolution included a paragraph that "calls for the Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians, which leads to a climate of mistrust and discrimination that can open the door to horrible crimes" such as the murder in Alabama. Id. The second resolution targeted anti-gay advertisements, naming one of the plaintiffs by name. Id. at 1119–20. The resolution stated that ads insinuating that sexual orientation could be changed are "erroneous and full of lies," and further stated that "ads suggesting gays or lesbians are 'immoral and undesirable create an atmosphere which validates oppression of gays and lesbians' and encourages maltreatment of them." Id. at 1120.

Subsequently, the plaintiffs sued the City alleging that the letter and resolutions violated the Establishment Clause. Id. at 1120. The district court dismissed the complaint for failure to state a

6

claim and the Ninth Circuit affirmed. Applying the Lemon test, the Ninth Circuit addressed each prong in turn.

Beginning with the purpose prong, the Ninth Circuit held that "although the letter and resolutions may appear to contain attacks on the plaintiffs' religious views, in particular that homosexuality is sinful, there is also a plausible secular purpose in the defendants' actions—protecting gays and lesbians from violence—and that therefore the plaintiffs could not state a claim under the purpose prong." Id. at 1121. The court further noted that "any secular purpose, no matter how minimal, will pass the test." Id. at 1122. The Supreme Court recently clarified the purpose prong, however, and this highly deferential standard no longer applies. Rather, "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." McCreary County, Kentucky v. Am. Civil Liberties Union of Kentucky, ___ U.S. ___, 125 S.Ct. 2722, 2735 (2005). Where the purported secular purpose is "secondary" and the purpose of the statute is "a predominantly religious one," the government action fails the purpose prong. Id. at 2736. Taken together, these cases establish that the protection of gay and lesbian rights is a legitimate secular purpose, and that this purpose will defeat a claim based on the purpose prong so long as it is not secondary to a predominantly religious purpose.

Turning to the primary effect prong, the Ninth Circuit held in American Family Ass'n that the provision in the City's Alabama resolution pertaining to the Religious Right's accountability for its rhetoric against gays and lesbians was "more of an afterthought and any disparagement of the Religious Right is not the primary effect of the resolution. Read as a whole, the primary effect is a denouncement of hate crimes and a call for action by the Alabama legislature." American Family Ass'n, 277 F.3d at 1122. Regarding the other resolution and the letter, the court stated that they presented a "closer question" in that the documents were "directly aimed at the plaintiffs and both documents contain[ed] statements from which it may be inferred that the defendants are hostile towards the religious view that homosexuality is sinful or immoral." Id. However, the court concluded that this hostility "was not the principal effect of the defendants' actions," and that the documents, "read in context and as a whole, are primarily geared toward promoting equality for gays

7

1    and discouraging violence against them." Id.  Any "statements from which disapproval can be
2    inferred [were] only incidental and ancillary." Id. at 1123.

3         Finally, the court held that the City's actions did not amount to excessive entanglement,
4    because "[p]olitical divisiveness . . . has never been relied upon as an independent ground for
5    holding a government practice unconstitutional." Id. at 1123 (internal quotations omitted).

7        B.    Resolution 168-06

8         Given the similarities between the facts as alleged in plaintiffs' complaint and the
9    circumstances in American Family Ass'n, the court will consider Resolution 168-06 using the
10   framework of that case, while addressing the key differences between the two situations.

12            1.    Secular Purpose
13       "The eyes that look to purpose belong to an objective observer, one who takes account of the
14   traditional external signs that show up in the text, legislative history, and implementation of the
15   statute, or comparable official act." McCreary County, 125 S.Ct. at 2734 (internal quotations
16   omitted).  This hypothetical objective observer is also "presumed to be familiar with the history of
17   the government's actions and competent to learn what history has to show." Id. at 2737.

18        Defendants assert that the purposes of Resolution 168-06 were "to denounce discrimination
19   against same-sex couples, and to try to preserve for San Francisco children the opportunity to be
20   placed for adoption with qualified families without regard to sexual orientation." These purposes are
21   evident from the wording of the resolution.  The preamble to the Resolution identifies it as urging
22   Cardinal Levada "to withdraw his discriminatory and defamatory directive that Catholic Charities of
23   the Archdiocese of San Francisco stop placing children in need of adoption with homosexual
24   households." Compl. ¶ 29.  The Resolution condemns the Vatican's attempt to "meddl[e] and . . .
25   negatively influence" the City's established customs and traditions regarding adoption by same-sex
26   couples, and claims that "[s]ame-sex couples are just as qualified to be parents as are heterosexual
27   couples." Id.  The Resolution urges the Archbishop and Catholic Charities serving San Francisco to

8

"defy all discriminatory directives of Cardinal Levada," and the operative clause repeats the urge to Cardinal Levada from the preamble. Id. While the Resolution also contains direct attacks on Cardinal Levada's statements in the Considerations document, calling them "hateful and discriminatory," "absolutely unacceptable," "insulting and callous," and showing "insensitivity and ignorance," these provisions regarding the Congregation's statement of religious doctrines are secondary to the Resolution's main purpose of promoting adoption by same-sex couples and equality for homosexuals.

Plaintiffs assert that the actual purpose of Resolution 168-06 is "to criticize and condemn the Catholic Church, Catholic religious leaders, and Catholic religious beliefs," and to "meddle in Church affairs." Plaintiffs further point to the Resolution's reference to the Vatican as a "foreign country" and describing the Congregation for the Doctrine of the Faith as the former "Holy Office of the Inquisition" as evincing anti-Catholic bigotry. Plaintiffs' generalized characterizations of the Resolution's language are unconvincing. It is clear from the text of the statute that any criticism of Catholic leaders or policies are presented in the context of same-sex adoption—a secular dimension of the City's culture and tradition that the City believes is threatened by the specific directive issued to the Archdiocese. Furthermore, the reference to the Vatican as a "foreign country" can reasonably be interpreted as an explicit attempt by the Board of Supervisors to characterize the City's dissent as one against a political entity rather than a religious organization, thereby seeking to avoid a religious conflict. While reference to the Holy Office of Inquisition may have been unnecessary to the substance of the Resolution and may be perceived as pejorative, it does not change the primary purpose or gist of the Resolution. It also is not historically inaccurate.

Accordingly, plaintiffs have failed to establish that the primary purpose of Resolution 168-06 is a religious one.

2.  Primary Effect

The effect prong of the Lemon test addresses "whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or

9

1  disapproval of religion." Vernon, 27 F.3d at 1398. This determination, like the purpose inquiry, is
2  conducted from the perspective of an informed, reasonable observer who is "familiar with the
3  government practice at issue." Kreisner v. City of San Diego, 1 F.3d 775, 784 (9th Cir. 1993). A
4  government action having the effect of perceived hostility toward a religious group does not violate
5  the Establishment Clause as long as the hostility is not the action's primary effect. See American
6  Family Ass'n, 277 F.3d at 1122–23; see also Vernon, 27 F.3d at 1398–99.

7  In Vernon, the City of Los Angeles investigated whether an Assistant Police Chief's religious
8  views were "improperly shaping the operations and policies of the Los Angeles Police Department."
9  Id. at 1389. Specifically, the city was concerned that the officer's beliefs were leading him to
10 discriminate against gays, lesbians and women in hiring and promotion, and that the officer was
11 consulting religious elders on issues of public policy. Id. at 1389–90. The officer alleged that this
12 investigation violated the Establishment Clause by disfavoring his religion. Id. at 1390. Regarding
13 the investigation's primary effect, the Ninth Circuit found that the city's concern with the officer's
14 consultation of religious leaders "suggests that the city disapproved of such consultation, possibly
15 due to the particular religious beliefs underlying such consultation." Id. at 1398. However, the court
16 went on to hold that "[n]otwithstanding the fact that one may infer possible city disapproval of
17 Vernon's religious beliefs from the direction of the investigation, this cannot objectively be
18 construed as the primary focus or effect of the investigation. The primary purpose of the government
19 action was the investigation of any possible impermissible or illegal on-duty conduct of Vernon." Id.
20 at 1398–1399.

21 Likewise, in American Family Ass'n, the Ninth Circuit found that the City's resolution and
22 letter were "directly aimed at the plaintiffs" and contained "statements from which it may be inferred
23 that the defendants are hostile towards the religious view that homosexuality is sinful or immoral."
24 American Family Ass'n, 277 F.3d at 1122. The City's actions nonetheless did not violate the
25 Establishment Clause because the perceived hostility was not the "principal effect" of the
26 government action. Id. Rather, "[t]he documents, read in context as a whole, are primarily geared
27 toward promoting equality for gays and discouraging violence against them." Id.
28

10

1    Unlike the government actions at issue in Vernon and American Family Ass'n, the language
2  in Resolution 168-06 can be interpreted as explicitly hostile toward the Congregation's views
3  regarding homosexuality and adoption by same-sex couples. No inference is necessary to conclude
4  that the Resolution espouses opposition to a religious view as expressed in the Considerations
5  document. This hostility alone, however, is not fatal to the Resolution's constitutionality unless the
6  hostility is the *primary* effect of the Resolution. Plaintiffs have failed to establish that this is the
7  case.

8    Read as a whole, the Resolution is explicitly directed at promoting same-sex adoption and
9  non-discrimination, largely for the reasons discussed above. Furthermore, taking the Resolution in
10 context reveals that the Resolution's criticisms of the statements in the Considerations document was
11 clearly secondary to the city's concern with the policies of the Archdiocese regarding adoption. The
12 Considerations document was released in 2003. It was not until the Congregation issued its directive
13 to the Archdiocese three years later that the City passed Resolution 168-06. Accordingly, the
14 primary effect of the Resolution was to voice the City's views with respect to adoption, a secular
15 activity. The fact that the City was commenting on the policy of the Archdiocese in this regard does
16 not violate the Establishment Clause simply because the secular activity was being performed by a
17 religious organization. See Bowen v. Kendrick, 487 U.S. 589, 613 (1988) (holding that activities
18 such as "adoption counseling and referral services" were not "specifically religious activities" and
19 were not converted into such activities by the fact that they [were] carried out by organizations with
20 religious affiliations"). Similarly, the Resolution's entreaty to the Archdiocese to defy Cardinal
21 Levada's discriminatory directives, though ostensibly an attempt to influence the general policies of
22 a religious organization, is primarily secular, as it is principally geared toward promoting an adoption
23 policy rather than meddling with internal church affairs.

24   The Resolution's primary effect of fostering non-discrimination is also evident when viewed
25 in the context of the City's history of adopting similar resolutions promoting gay and lesbian rights.[1]
26 As these previous resolutions demonstrate, the City often takes public, official positions regarding
27 the rights of homosexuals and has criticized a variety of prominent individuals and organizations for
28

11

their stances on homosexuality. Resolutions promoting non-discrimination against homosexuals, such as Resolution 168-06, do not implicate the Establishment Clause simply because they are adopted in response to the actions of a religious organization.

Accordingly, the primary message of Resolution 168-06 is neither an endorsement nor a disapproval of religion, but rather a promotion of adoption by same-sex couples and non-discrimination against gays and lesbians.

### 3. Excessive Entanglement

The final prong of the Lemon test asks whether the government action fosters excessive entanglement with religion. The Establishment Clause forbids both "administrative" and "political" entanglement. Vernon, 27 F.3d at 1399. "Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion." Id. Political entanglement and divisiveness, while of concern to courts in Establishment Clause cases, is insufficient by itself to constitute excessive entanglement. Id. at 1401; American Family Ass'n, 277 F.3d at 1123.

Plaintiffs' complaint contains no facts supporting excessive entanglement, but rather alleges conclusorily that the Resolution "creates excessive entanglement with religion." Compl. ¶ 40. In their pleadings, plaintiffs assert that "[a] formal resolution in which the government takes an official position on religious doctrine or takes sides in a religious matter fosters entanglement prohibited by the Establishment Clause." Opp. at 21. The cases cited by plaintiffs do not support this broad definition of entanglement.

In Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415 (2d Cir. 2002), the Second Circuit struck down portions of New York's kosher fraud laws as violating the Establishment Clause. The laws imposed a "prohibition on the sale of food products falsely represented 'to be kosher . . . or as having been prepared under . . . the orthodox Hebrew religious requirements.'" Id. at 419 n.3 (quoting N.Y. AGRIC. & MKTS. LAW § 201-a(1)). The law defined the term "kosher", created a regime of inspection, regulation, and supervision of kosher food products and provided for

12

civil and criminal penalties for violations of its provisions. Id. at 423–425. The court found excessive entanglement because "the State [had] effectively aligned itself with one side of an internal debate within Judaism," the law required the State to "either interpret religious doctrine or defer to the interpretations of religious officials in reaching its official position," and the law amounted to "a fusion of governmental and religious functions." Id. at 426-28. The problematic legislation at issue in Commack required the state to directly engage in complex, competing doctrines of religious law and adopt official interpretations of that law. The statute therefore mandated the type of "comprehensive, discriminating, and continuing state surveillance of religion" forbidden by the Establishment Clause. Vernon, 27 F.3d at 1401. It was not simply the promulgation of an official position regarding a secular issue, as is Resolution 168-06.

Plaintiffs also cite Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94 (1952), a case decided before the now-familiar entanglement test was established. Kedroff held that internal church governance and membership must be administered by church officials free of government control. Id. 116–17. This case, too, is inapplicable. Resolution 168-06 is not an attempt to control church policy. Rather, the Resolution is a non-binding and non-regulatory announcement of the City's views with respect to same-sex adoption. The City's involvement with the Archdiocese arising from Resolution 168-06 began and ended when the Resolution was adopted.

The facts of the case at bar raise interesting questions about the public debate of political issues vis-a-vis religious views and doctrines. Accepting plaintiffs' position would mean that any religiously-initiated debate even on a political issue could not be joined by a publicly-elected body's response without resulting in excessive entanglement. The Congregation's Considerations document not only states the Vatican's position with regard to homosexual unions, but also instructs Catholic politicians as to their duties as Catholics. Article IV, section 10 of the document states that

> If it is true that all Catholics are obliged to oppose the legal recognition of homosexual unions, Catholic politicians are obliged to do so in a particular way, in keeping with their responsibility as politicians. Faced with legislative proposals in favour of homosexual unions, Catholic politicians are to take account of the following ethical indications.

13

> When legislation in favour of the recognition of homosexual unions is proposed for the first time in a legislative assembly, the Catholic law-maker has a moral duty to express his opposition clearly and publicly and to vote against it. To vote in favour of a law so harmful to the common good is gravely immoral.
> When legislation in favour of the recognition of homosexual unions is already in force, the Catholic politician must oppose it in ways that are possible for him and make his opposition known; it is his duty to witness to the truth.

Section 10 goes on to state that it is the duty of the Catholic politician to seek the total abrogation, or at least the partial repeal, of legislation in favor of homosexual unions.

The Congregation for the Doctrine of the Faith provoked this debate, indeed may have invited entanglement, by its Considerations statement. This court does not find that our case law requires political bodies to remain silent in the face of this provocation. See Vernon, 27 F.3d at 1397 (discussing cases in which government actions targeting religious conduct were upheld where the actions were designed to avoid Establishment Clause violations). Elected officials are certainly free to express their electorates' views. R.J. Reynolds Tobacco Co. v. Shewry, 423 F.3d 906, 918 (9th Cir. 2005) (quoting Keller v. State Bar of Cal., 496 U.S. 1, 12–13 (1990)) ("Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents"). Ordinarily this is done in the form of a resolution or similar statement adopted by the political body.

In view of Article IV, section 10, of the Considerations statement, Resolution 168-06 is a measured response. It does not constitute excessive entanglement under existing case law. There is no regulatory enforcement, no law adopted nor other action taken by virtue of the Resolution. It is merely the exercise of free speech rights by duly elected office holders. In sum, Resolution 168-06 does not create an impermissible entanglement between government and religion. Because plaintiffs have also failed to establish that Resolution 168-06 lacks a primarily secular purpose or a primarily secular effect, plaintiffs have failed to plead a cause of action under the Establishment Clause.

CONCLUSION

For the reasons stated above, the court GRANTS defendants' motion to dismiss. The action DISMISSED in its entirety with prejudice. The clerk shall close the file.

IT IS SO ORDERED.

Dated: Nov. 28, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

**ENDNOTES**

1.  The court has taken judicial notice the following resolutions adopted by the City: Resolution 129-06, urging the IRS to acknowledge domestic partnerships; Resolution 166-06, urging Governor Schwarzenegger to submit an amicus brief to the New York Supreme Court of Appeals in support of same-sex marriage; Resolution 364-06, condemning government-sanctioned violence at Moscow's first Gay Pride Celebration and urging Moscow officials to support the rights of Russia's LGBT community; Resolution 73-05, urging the United States Supreme Court to accept the hearing of a legal challenge to Florida's prohibition of adoption of children by gays and lesbians; Resolution 127-05, urging U.S. Secretary of Education Margaret Spellings to retract her condemnation of PBS programming depicting a lesbian couple, and urging Spellings to apologize and support tolerance for the LGBT community; Resolution 454-05, condemning a San Francisco 49ers training video that was offensive to the LGBT community; Resolution 308-03, urging Senator Rick Santorum to resign as a Republican Senate leader and apologize for comments likening homosexuality to polygamy, incest, and adultery; and Resolution 199-00, urging Dr. Laura Schlessinger to refrain from making inciteful comments about gays and lesbians and urging media companies to discontinue Schlessinger's radio program if she continued to make such statements. RJN, Exh. H.